T.C. Memo. 2011-106

UNITED STATES TAX COURT

FREDRIC J. AND DUSHANKA LOWE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23670-08.                    Filed May 19, 2011.

David R. Bosse and Mary L. Harriss, for petitioners.

Kathleen A. Tagni, for respondent.


MEMORANDUM OPINION

LARO, Judge:  This case is before the Court on respondent's
motion for summary judgment filed pursuant to Rule 121.[1]
Respondent determined a $50,252 deficiency in petitioners' 2003

_____

[1]Section references are to the applicable version of the
Internal Revenue Code, and Rule references are to the Tax Court
Rules of Practice and Procedure.  Some dollar amounts are
rounded.

Federal income tax and a $10,050 accuracy-related penalty under section 6662(a). The deficiency largely arises from the distribution of a cash value life insurance policy (policy) from a nonexempt employee trust to petitioner Frederic J. Lowe (Mr. Lowe).[2] On November 24, 2010, respondent filed a motion for summary judgment (motion). On December 10, 2010, petitioners filed a response to respondent's motion (response). Respondent's motion asks the Court to decide as a matter of law that the value of the policy is its accumulated value on the date of distribution determined without regard to surrender charges. That motion also asks the Court to find petitioners liable for an accuracy-related penalty under section 6662(a). Petitioners agree in their response that the material facts of the case are not in dispute, but they contend that the value of the policy must be determined by taking surrender charges into account.

We hold that section 402(b)(2) requires that the value of a life insurance policy distributed from a nonexempt employee trust is its fair market value as of the date of distribution and may require that surrender charges be taken into account. For the reasons discussed below, we find that genuine issues of material fact remain as to the fair market value of the policy. We will therefore deny respondent's motion for summary judgment as to the

---

[2]Respondent also determined computational adjustments to amounts petitioners claimed as itemized deductions and exemptions.

value of the policy.  We find it premature to decide the second issue of whether petitioners are liable for a section 6662(a) accuracy-related penalty absent a determination of the fair market value of the policy.  We thus reserve our decision on that issue.

## Background

The background facts are drawn from the pleadings, the motion, and the response.  Petitioners Mr. Lowe and Dushanka Lowe (Ms. Lowe) are husband and wife who resided in Illinois when their petition was filed.

Mr. Lowe was an employee and the sole shareholder of Smart Money Strategies, Inc. (Smart Money), an S corporation.  Ms. Lowe was an employee of Smart Money.  In 2002 Smart Money adopted the National Variable Benefit Plan and Trust as an employee welfare-benefit plan under sections 419 and 419(A).[3]  Smart Money's stated purpose in adopting the plan was to provide benefits to certain covered employees as a reward for past and future faithful service.  Petitioners were the only employees covered by the plan as Smart Money had no other employees.  The benefits provided to petitioners under the plan included death and severance benefits.  Smart Money funded these benefits with a

---

[3]We refer to the welfare benefit plan as the "plan" and the trust that owned the plan's assets as the "trust".  The parties agree that the trust was not exempt from taxation under sec. 501(a).

cash value life insurance policy on the life of Mr. Lowe and a term life insurance policy on the life of Ms. Lowe. The trust was the named owner of the cash value life insurance policy on Mr. Lowe's life.

The policy covering Mr. Lowe was a variable universal life insurance policy[4] that provided Mr. Lowe with a death benefit of $4,213,485, and carried a planned annual premium of $75,000. The terms of the policy agreement specified that a surrender charge[5] would be levied upon the owner of the policy if the policy was terminated before a specified date. The policy also specified that the surrender charge would gradually decline and would be eliminated 14 years after the policy's effective date. Ms. Lowe was the named beneficiary of Mr. Lowe's policy.

Between 2002 and 2003 Smart Money paid premiums due on the policy by contributing cash to the trust. In late 2003 Smart Money terminated its participation in the plan and trust, which in turn caused ownership of the policy to transfer from the trust to Mr. Lowe. On the date of distribution, the accumulated value

---

[4]Under a variable universal life policy, the premiums paid by the policy holder are invested in securities, and the payouts at death fluctuate with the performance of the investments, though there usually is a minimum guaranteed death benefit. See Schwab v. Commissioner, 136 T.C. __, __ (2011) (slip op. at 7); Cadwell v. Commissioner, 136 T.C. __, __ (2011) (slip op. at 8 n.9).

[5]A surrender charge is a fee applied against the value of the life insurance contract if the contract is terminated within a period specified in that contract.

of the policy without regard to surrender charges was $140,901, and the value of the policy after surrender charges was zero.

Petitioners received a 2003 Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., which reported a current year cost of life insurance protection of $4,426.16. Petitioners reported that amount on their 2003 Form 1040, U.S. Individual Income Tax Return (2003 return). Petitioners did not, however, report any income from the distribution of the policy on their 2003 return.

By notice of deficiency dated June 27, 2008, respondent determined that petitioners had unreported income equal to $140,901, or the value of the policy distributed to Mr. Lowe without regard to the surrender charges. Respondent also determined that petitioners were liable for an accuracy-related penalty under section 6662(a).

## Discussion

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Either party may move for summary adjudication upon all or any part of the legal issues in controversy. Rule 121(a). Full or partial summary judgment is appropriate where the record shows that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); Craig v. Commissioner, 119 T.C. 252,

259-260 (2002). As the moving party, respondent bears the burden of proving that no genuine issue exists as to any material fact and that he is entitled to judgment as a matter of law. See Naftel v. Commissioner, 85 T.C. 527, 529 (1985). In deciding whether summary judgment is appropriate, we view the factual materials and the inferences drawn therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985). The parties contend that there are no genuine issues as to any material fact and that a decision may be rendered as a matter of law. For the reasons discussed below, we do not agree. Accordingly, we will deny respondent's motion.

The parties agree that the distribution of the policy from the trust was a taxable event, but they disagree over the amount which petitioners were required to report as taxable income on their 2003 return. Petitioners argue that the value of the policy distributed to Mr. Lowe should be determined under section 83 and that the value of the policy should be reduced by the amount of the surrender charges payable upon termination of the policy. Respondent argues that the value of the life insurance policy should be determined under sections 402(b)(2) and 72 and that the value as distributed to Mr. Lowe should be determined without regard to any surrender charges.

We begin with an overview of the relevant sections. Section 83 provides rules for the taxation of property transferred to an employee in connection with services performed by that employee. See sec. 1.83-1(a)(1), Income Tax Regs. That section requires a taxpayer to include in gross income the fair market value of the property transferred (less any amounts paid for such property) in the first year in which such property becomes transferable or is not subject to a substantial risk of forfeiture. Sec. 83(a); see also Childs v. Commissioner, 103 T.C. 634, 648 (1994), affd. without published opinion 89 F.3d 856 (11th Cir. 1996). Section 402(b)(2) provides "the amount actually distributed" or made available to a distributee by a nonexempt employee trust must be included in the distributee's gross income pursuant to the annuity rules of section 72. See also sec. 1.402(b)-1(c)(1), Income Tax Regs. Section 72 generally requires a distributee to include in his or her gross income any amount received by the distributee under a life insurance contract but allows the taxpayer to recover his or her investment in the contract as a nontaxable return of capital. See sec. 1.72-1(a), Income Tax Regs.

I.  Nonapplicability of Section 83

Petitioners argue that the distribution of the policy to them from the trust is a transfer in connection with the performance of services governed by section 83 and that section

402(b)(2) does not apply. We do not agree. It is a basic principle of statutory construction that where two statutes overlap in application, the more specific provision takes precedence over the more general provision. See <u>Bulova Watch Co. v. United States</u>, 365 U.S. 753, 758 (1961); <u>Wing v. Commissioner</u>, 81 T.C. 17, 30 n.15A (1983). The policy here was transferred to Mr. Lowe by way of a distribution from a nonexempt employee trust, a situation specifically contemplated by section 402(b). Section 83, which addresses the taxation of property transferred in connection with services, is thus general when compared with the specific application of section 402(b) to a distribution from a nonexempt employee trust.

Section 402(b) provides for a variety of Federal income tax consequences to an employee beneficiary who is a participant in a plan under section 401(a) when the related trust is not exempt from taxation under section 501(a). Section 402(b) contains specific provisions for contributions to and distributions from a nonexempt employee trust for the benefit of an employee beneficiary. Section 402(b)(1), which addresses <u>contributions</u> made by an employer to a nonexempt employee trust on behalf of an employee, requires the employee to include as gross income the amount of the contribution in accordance with the provisions of section 83. Section 402(b)(2), which addresses <u>distributions</u> from a nonexempt employee trust to an employee beneficiary,

requires the employee to include in gross income the amount of the distribution in accordance with section 72. We find no ambiguity in section 402(b) and believe that section 402(b)(2) speaks specifically to the policy distributed to Mr. Lowe.[6] We presume that Congress "says in a statute what it means and means in a statute what it says" and shall rely on the specific provision of section 402(b). Conn. Natl. Bank v. Germain, 503 U.S. 249, 253-254 (1992).

Because we have determined that section 402(b)(2) applies to the policy distributed to petitioners, we only look to section 83 to the extent that section 402(b) requires us to do so. See sec. 1.83-8(a)(4), Income Tax Regs. ("to the extent a transfer is subject to section 402(b) * * *, section 83 applies to such a transfer only as provided for in section 402(b)"). Despite petitioners' contentions of the applicability of section 83, section 402(b)(2) does not require that section 83 applies. Congress was clear that section 83 determines the tax consequences to an employee beneficiary who receives the benefit

---

[6]We are not persuaded that Smart Money provided the policy to Mr. Lowe in connection with his performance of services so that sec. 83 would apply. Petitioners offer no elaboration on the specific services Smart Money provided or any services Mr. Lowe provided to Smart Money. In addition, petitioners characterize the transfer of the policy as a "distribution" from the plan and trust in both the petition and the memorandum they filed in support of their response. Such a characterization, we believe, is not merely a matter of semantics but reflects an objective characterization of the distribution by petitioners as to the true nature of what they received from the trust.

of a <u>contribution</u> made by an employer to a nonexempt employee trust. Congress was also clear that section 72 determines the tax consequences to an employee beneficiary who receives a <u>distribution</u> from a nonexempt employee trust. This distinction, we believe, shows that Congress was fully aware of the different alternatives for taxing distributions from a nonexempt employee trust and intended that the taxability of a distribution from a nonexempt employee trust to be determined under section 72. If Congress had intended for distributions from a nonexempt employee trust to be determined under section 83, it would have said so, but Congress did not say so. Consequently, we give effect to Congress' unambiguously expressed intent and proceed with our analysis under sections 402(b)(2) and 72. See <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-843 (1984).

II. <u>Application of Sections 402(b)(2) and 72</u>

Because we have found that section 402(b)(2) controls the tax consequences of the policy distributed to petitioners, we now turn our attention to that section to determine the methodology for determining the value of the policy. Section 402(b)(2) provides that "the amount actually distributed" or made available to a distributee by a nonexempt employee trust shall be taxable in the year distributed or otherwise made available to the

beneficiary as provided by section 72. See also sec. 1.402(b)-1(c)(1), Income Tax Regs.

Section 72(e) prescribes rules for the tax treatment of amounts received under a life insurance contract which are not received as annuities. In general, any nonannuity amount received before the annuity starting date is includable in gross income to the extent allocable to income on the contract.[7] See sec. 72(e)(2)(B); Matthies v. Commissioner, 134 T.C. 141, 151 (2010). Here, the trust distributed the policy to Mr. Lowe as a lump sum before the annuity starting date. The cross-reference of sections 402(b)(2) and 72 thus compels the application of 72(e) to the distribution petitioners received.

Section 72(e)(3)(A) requires that the amount allocable to income, and thus the amount to be included in gross income, should not exceed the excess (if any) of "the cash value of the contract (determined without regard to any surrender charge) immediately before the amount is received" reduced by the taxpayer's "investment in the contract". The parties agree that the cash value of the policy determined without regard to

---

[7]Although sec. 72(e)(5) generally supersedes the applicability of sec. 72(e)(2)(B) with regard to life insurance contracts, see sec. 72(e)(5)(A), (C), sec. 402(b)(2) provides that distributions from a nonexempt employee trust before the annuity starting date shall be included in the gross income of the distributee without regard to sec. 72(e)(5). Thus, sec. 72(e)(5) is inapplicable to the distributions received by Mr. Lowe, and sec. 72(e)(2)(B) is the controlling provision for purposes of income inclusion.

surrender charges is $140,901.  A taxpayer's investment in the contract is defined as the amount of consideration paid for the contract less amounts previously received under the contract that were excludable from gross income.  See sec. 72(e)(6); Campbell v. Commissioner, 108 T.C. 54, 61-62 (1997).  Because petitioners did not pay any consideration for the contract, we treat Mr. Lowe's investment in the contract (i.e., his basis) as zero.  Thus, the maximum amount that petitioners would be required to include as gross income under section 72(e)(3) is the cash value of the policy without regard to surrender charges, or $140,901.

Respondent would have us stop our analysis after a plain reading of section 72 and conclude that the value of the policy for purposes of section 402(b) is the cash value of the policy without regard to surrender charges.  But section 402(b)(2) does not require that we read section 72 in isolation.  The cross-reference of section 402(b)(2) requires only that we use section 72 as a guide to allocating the value of the policy between taxable income and a nontaxable return of the investment in the contract (i.e., petitioners' return of capital).  Section 402(b)(2) provides that the "amount actually distributed" to the distributee is taxable under section 72.  The "amount actually distributed" is thus the amount petitioners are required to include in their gross income, subject to the limitation imposed by section 72(e)(3)(A).

We recently analyzed the interplay of sections 402(b)(2) and 72 in the context of distributions from a nonexempt trust in Schwab v. Commissioner, 136 T.C. __ (2011).  We believe our reasoning in Schwab is directly on point to the instant case and apply its reasoning herein.  We observed that "amount actually distributed" under section 402(b)(2) is not synonymous with the accumulated cash value of the policy.  Like petitioners, the taxpayers in Schwab received distributions of life insurance policies from a nonexempt employee trust and challenged the Commissioner's determination that the values of those policies should be determined without regard to surrender charges.  We held that for the purposes of section 402(b)(2), the phrase "amount actually distributed" means the fair market value of what was actually distributed.

We reasoned in Schwab that the regulations under section 402(a) (prescribing rules for distributions from exempt employee trusts) and section 402(b)(2) (prescribing rules for distributions from nonexempt employee trusts) provide differing interpretations of the phrase "amount actually distributed".  We were cognizant of our decision in Matthies v. Commissioner, supra, in which we held that a distribution of a life insurance policy from an exempt employee trust should be determined without regard to surrender charges.  But we noted that the regulations under section 402(a) require a taxpayer to include as the "amount

actually distributed" the "entire cash value" of the life insurance policy, see sec. 1.402(a)-1(a)(2), Income Tax Regs., whereas the regulations under section 402(b)(2) indicate by way of an example that the amount to be included as gross income is the "entire value" of the contract, see sec. 1.402(b)-1(c), Income Tax Regs. We deemed this distinction not insignificant. We concluded that while the "entire cash value" of a life insurance policy is determined without regard to surrender charges, the "entire value" of a life insurance policy is determined by its fair market value, which may include surrender charges. We thus rejected the simple proposition that surrender charges should never count or that they should always count, instead reading section 402(b) to require a court to consider the payment of surrender charges as part of a more general inquiry into the policy's fair market value.[8]

But we also recognized in Schwab that the fair market value of an insurance contract can be a "slippery concept", the determination of which requires further analysis. See Schwab v. Commissioner, supra at __ (slip op. at 8). On the facts in Schwab, we were persuaded that the only value the taxpayers received from the distributions of their policies was a small amount of insurance coverage attributable to premiums their employer previously paid. We also had in the record the base

_____

[8]The Commissioner moved the Court to reconsider our Opinion in Schwab, and we denied that motion.

rates for the guaranteed maximum monthly cost of insurance rates and were able to make a tentative effort at calculating the fair market values of what the taxpayers actually received.

The facts of the instant case are virtually identical to those presented in <u>Schwab</u>.  The policies were variable universal life insurance policies with steep premiums, and both were distributed from nonexempt employee trusts in late 2003.  Both policies carried surrender charges that rendered the accumulated value of the policy zero or less than zero.  In <u>Schwab</u> we decided that the fair market values of the policies the taxpayers received were less than their accumulated values.  Here, we are unable to determine the fair market value of Mr. Lowe's policy because the record does not allow us to do so.  Accordingly, we will deny respondent's motion for summary judgment.

<u>An appropriate order will be issued denying respondent's motion for summary judgment</u>.